ORIGINAL

1

2

3

4    _____
           EXCERPT
    HEARING BEFORE THE ALASKA WORKERS' COMPENSATION BOARD
5              IN RE:  Thomas Sloan
               Case No. 200317063
6    _____

7

8                    February 9, 2006

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
                                        Exhibit  1
24
                                        Page  1  of  38
25

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2

 3   For Defendant:

 4       Robert J. Bredesen
         RUSSELL, TESCHE, WAGG, COOPER & GABBERT, PC
 5       510 L Street, Suite 300
         Anchorage, Alaska 99501
 6       (907) 258-1747

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit _1_
Page _2_ of _38_

```
1                          PROCEEDINGS
2              DESIGNATED CHAIR:  I'm turning on the tape
3    recorder and the record should show that this is an
4    administrative proceeding in the matter of Thomas Sloan
5    versus Chugach Eareckson Support Services and Zurich
6    American.
7              This is docket number 200317063.  We are
8    convened at the Department of Labor and Work Force
9    Development in Anchorage, Alaska.  Today's date is
10   February 9, 2006.
11             This is a hearing being held before the
12   Alaska Workers' Compensation Board.  My name is Rosemary
13   Foster.  I'm the designated chair.  Will the other board
14   members make their appearance?
15             MS. HUTCHINGS:  Linda Hutchings.
16             (Inaudible)
17             DESIGNATED CHAIR:  Now, Mr. Sloan, you're
18   appearing by phone today?
19             MR. SLOAN:  Yes.
20             DESIGNATED CHAIR:  And where are you calling
21   from?
22             MR. SLOAN:  From California.
23             DESIGNATED CHAIR:  All right.  If at any
24   point, you can't hear us, speak up right away.  We'll
25   rearrange ourselves or repeat the testimony as
```

Exhibit 1
Page 3 of 38

 1  necessary.

 2            MR. SLOAN:  Okay.

 3            DESIGNATED CHAIR:  All right.  May we have

 4  an appearance from the employer?

 5            MR. BREDESEN:  Robert Bredesen on behalf of

 6  Chugach Eareckson Support Services and Zurich American

 7  Insurance Company.

 8            DESIGNATED CHAIR:  Thank you.  Mr. Sloan,

 9  we're going to be taking your testimony today, so I'm

10  going to ask you to raise your right hand and be sworn.

11                 (Mr. Sloan sworn in.)

12            DESIGNATED CHAIR:  The record should show

13  that Mr. Sloan has answered in the affirmative.

14            Mr. Sloan, you should have received a packet

15  of documents, a binder of documents that the employer

16  has prepared and is referring to in connection with this

17  case today.

18            Are you familiar with that?

19            MR. SLOAN:  Yes. (Inaudible)

20            DESIGNATED CHAIR:  So when we make

21  references to them today, you'll know what we're talking

22  about and you can follow along?

23            MR. SLOAN:  Yes, I can.

24            DESIGNATED CHAIR:  Now, the way this

25  normally works is we give each party 20 minutes total


Exhibit 1
Page 4 of 38

1   for opening and closing statements.  You can use that

2   time however you like.  You can make a five-minute

3   opening statement and a 15-minute closing statement or

4   split the time.  It's up to you.

5           But Mr. Bredesen will be making his opening

6   statement and then we'll give the balance of his time to

7   him at the close.  Since this is a fraud matter and the

8   employer is making these allegations, I'll ask

9   Mr. Bredesen to present his case first.

10          So you need to listen carefully to what he

11  is saying.  It helps if you have a pen and pencil or a

12  pen and paper to jot down notes.

13          You're entitled to ask questions about the

14  case and you're also entitled to question any witnesses

15  that he presents as part of his case.  And that's what's

16  known as your cross examination.

17          MR. SLOAN:  Okay.

18          DESIGNATED CHAIR:  He is allowed to then

19  follow-up on that.  And then when he is finished with

20  his presentation, his documents and his witnesses, then

21  we'll turn to you and we will hear from you about your

22  version of what has gone on here.

23          And then we'll also take the testimony of

24  your witness and then Mr. Bredesen is entitled to cross

25  examine both you and your witness.

Exhibit 1
Page 5 of 38

1            So when we finish with that procedure, we

2    will then go to closing statements.  And unless the

3    record is held open for any reason, once we close the

4    record, the decision in this matter will be issued

5    within 30 days.

6            MR. SLOAN:  Okay.

7            DESIGNATED CHAIR:  Are there any preliminary

8    matters from the parties before we go ahead with opening

9    statements?

10           MR. SLOAN:  What do you mean by preliminary

11   matters?

12           DESIGNATED CHAIR:  Well, anything, any

13   questions or comments?  If you have questions or

14   anything of that nature, Mr. Sloan, as we go along,

15   you're welcome to ask about it.  Otherwise, I have given

16   you a brief description of the procedure today.

17           We'll probably be taking a break around

18   10:30 to 10:40 and, depending on how much time is left,

19   we may go through the lunch hour.  It looks as though

20   the employer has some witnesses here today, so we'll

21   attempt to get through those and complete this matter as

22   expeditiously as possible, so this is the only other

23   case on the board's docket today, we may go through

24   lunch or we may not, depending on what the board wants

25   to do.

Exhibit    1
Page  6  of  38

1          But we'll take that up later on as we go
2    along.  All right.
3          MR. SLOAN:  Basically, I do have a question
4    about this.  Basically, from my understanding of reading
5    these documents that the employer has presented on this
6    fraud case, and they are basing that fraud case on
7    redefining the word benefit.

8          They are citing imminent domain.  And
9    basically what I am hearing is what he is claiming is a
10   benefit is defined as due process of law, the right of
11   discovery, the right of hearings and the pre-hearings.

12         DESIGNATED CHAIR:  Mr. Sloan, we can hear
13   from you about that as part of your opening statement.
14   What I would like to do is since Mr. Bredesen is asking
15   that the board make these findings about this matter,
16   I'm going to ask that he go first and sort of give the
17   board the background and the nature of the employer's
18   contentions in this case and what they intend to prove.

19         Then we'll let you either ask your question
20   or go ahead and make your opening statement and then
21   we'll go forward from there.

22         I don't want you to launch into your
23   argument on the merits quite yet.  Let's hear from
24   Mr. Bredesen first.

25         Mr. Bredesen, are you ready?

Exhibit    1
Page  7  of  38

```
 1              MR. BREDESEN:  Yeah.

 2              DESIGNATED CHAIR:  All right.  It's about

 3   9:35, our time, so I'll keep track of the time for the

 4   parties and let you know how much you have used up in

 5   your opening statements so you know how much you have to

 6   use up at the close.

 7              Mr. Bredesen, do you want to go ahead?

 8              MR. BREDESEN:  Good morning.

 9              DESIGNATED CHAIR:  Mr. Sloan, can you hear

10   Mr. Bredesen?

11              MR. SLOAN:  I haven't heard him yet.

12              DESIGNATED CHAIR:  All right.

13              MR. BREDESEN:  Can you hear me now?

14              DESIGNATED CHAIR:  Can you hear him now?

15              MR. SLOAN:  No.

16              DESIGNATED CHAIR:  Mr. Bredesen is going to

17   rearrange himself here.  Mr. Bredesen is going to move

18   closer to the phone and we're going to rearrange

19   ourselves to make sure you can hear us.

20              Mr. Bredesen, would you say something and

21   we'll see if he can hear you now?

22              MR. BREDESEN:  Can you hear me now?

23              MR. SLOAN:  Yes, just barely.

24              MR. BREDESEN:  Okay.

25              DESIGNATED CHAIR:  All right.  Let us know,
```

1  Mr. Sloan, if you can't, but we'll ask Mr. Bredesen to
2  go ahead now.

3          MR. BREDESEN:  Good morning.  This is a
4  fraud case, as was made very clear in the opening.  It
5  also happens to be the ugliest and nastiest case I have
6  ever had to work on.

7          And I realize that it's a very difficult
8  thing for a board panel to do, to make a finding of
9  fraud, because in order to do that you have to decide
10  that somebody has lied.

11          MR. SLOAN:  Excuse me, but you're dropping
12  in and out.

13          DESIGNATED CHAIR:  We're going to try and
14  move your phone -- move our phone so that it's situated
15  between me and Mr. Bredesen.

16          MR. BREDESEN:  These cases are difficult, I
17  realize, because it's uncomfortable.  You must be in an
18  uncomfortable situation having to decide whether
19  somebody has lied.

20          However, the facts of this case and the
21  opposing stories that exist do not leave you the option
22  of finding that somebody hasn't lied in this case.  It's
23  either Mr. Sloan or it happens to be everybody else in
24  perfect harmony.

25          Fortunately for you, in my view, I have


Exhibit 1
Page 9 of 38

1    brought what I think is probably the easiest case I have

2    ever brought to a board hearing.  The evidence is

3    completely one-sided.  This case comes from Jennie

4    Island, which is a little island at the end of the

5    Aleutian chain where some military facilities exist,

6    emergency landing strips, some missile defense

7    facilities are out there, a lot of military facilities.

8              And Mr. Sloan worked in the communications

9    section on the island.  He has accused a former

10   supervisor and co-worker, somebody who he didn't get

11   along with and who was documenting his incompetence and

12   laziness on the job and was basically building a record

13   for him to be shipped out, he has accused Mr. Fizzel

14   (phonetic), not just of attacking him on the island.

15             He claims he was body slammed in the dining

16   area, but he has gone much further than that.  He has

17   also accused Mr. Fizzel of being some sort of homosexual

18   predator, of having sexually touched him on occasions.

19             He has also accused Mr. Fizzel of being some

20   sort of baby fox killer.  It's just really wild and

21   really bizarre.  Mr. Sloan's story has changed over

22   time.  It started out as a single person attack by

23   Mr. Fizzel.

24             He later expanded it to include another

25   co-worker and supervisor he didn't get along with,

1    Mr. Carl Stargardt, who is here today, claiming that

2    somehow Mr. Stargardt was involved.

3              When he was confronted with this fundamental

4    change in his story from a one person attack to a two

5    person attack, he changed his story yet again to allege

6    that there were two attacks on separate days by

7    Mr. Fizzel and Mr. Stargardt.

8              He has told his -- or he has thrown these

9    mudslinging accusations out widely to a number of

10    people, including medical professionals from whom he

11    used to get various prescriptions and work releases,

12    including narcotic drugs.

13              Mr. Fizzel could not be here today

14    unfortunately.  He is working -- took a new job out at

15    Blake Island in the Pacific.  It is just not feasible to

16    bring him here today, but he was --

17              MR. SLOAN:  I couldn't hear that.

18              MR. BREDESEN:  Mr. Fizzel could not be here

19    today.  Again, he works out on Blake Island now, but he

20    was deposed telephonically and has categorically denied

21    all of Mr. Sloan's wild accusations.

22              Mr. Stargardt is here today, and he is

23    expected to testify similarly, that none of what

24    Mr. Sloan alleges ever occurred.

25              It's important to note that we will also


Exhibit ___1___
Page ___11___ of ___38___

1  have deposition testimony --

2              MR. SLOAN:  Excuse me.  You are dropping in

3  and out again.

4              MR. BREDESEN:  Quite frankly, Mr. Sloan, I

5  don't believe you.  Are you going to be near a landline

6  any time soon?

7              MR. SLOAN:  Yes.  I'm almost near a

8  landline.  I can call you up, but I can't hear you at

9  all now.

10             DESIGNATED CHAIR:  How far away are you from

11 a landline, Mr. Sloan?

12             MR. SLOAN:  About five feet.

13             DESIGNATED CHAIR:  Well, can you call back

14 269-4980 and we'll hang up.

15             MR. SLOAN:  Okay.  I'll do that.

16                 (There was a short break.)

17             DESIGNATED CHAIR:  Mr. Bredesen, where did

18 we leave off?

19             MR. BREDESEN:  In addition to the two

20 individuals who Mr. Sloan has made these wild

21 accusations against who have flatly and unequivocally

22 denied all of his allegations, or will deny all of his

23 allegations, we have a witness who testified via

24 deposition, and his name is Melvin Alstots (phonetic).

25                 And Mr. Sloan's story is that the assault

Exhibit  1
Page 12 of 38

1   took place in the dining area of the central facility on
2   Jennie Island, in particular, it was in an area of the
3   dining facility where people go to bus their trays and
4   drop off their dishes and silverware.

5           Mr. Alstots operated a dishwasher in that
6   room.  He worked there.  Mr. Sloan's story was that he
7   was actually putting down his tray and putting away his
8   silverware into little bins when Mr. Fizzel ran up to
9   him and slammed into him, hit him from the side,
10  practically knocked him over a table which is smaller
11  than this table here that the board is using.

12          DESIGNATED CHAIR:  Can you give us a
13  description?

14          MR. BREDESEN:  This table I would say is
15  more about five by 12.  Mr. Alstots therefore would have
16  been within arm's reach of this violent, loud, dramatic
17  assault.  And when we located him, we took his
18  deposition, he didn't -- he never saw anything of the
19  kind.

20          It is simply inconceivable that a person
21  closer to Mr. Sloan -- closer to this assault than I am
22  sitting to you.  And for the record, I could probably
23  reach across the table and shake hands with any number
24  of you.  It's simply inconceivable that he would have
25  just missed this violent assault.


Exhibit 1
Page 13 of 38

1           Mr. Sloan has no witness who will support,

2    with any personal knowledge, any of his accusations.

3    The medical evidence also fully supports, we believe,

4    the employer's position.  As it turns out, we wound up

5    deposing the individuals who evaluated him within hours,

6    days and weeks of this alleged incident.

7           Again, it's our position Mr. Sloan had

8    decided he was going to lie about being attacked and

9    therefore went to doctors and lied to them about it as

10   well.  And the medical records support those

11   contentions.

12           MR. SLOAN:  May I ask a question now?

13           MR. BREDESEN:  Excuse me.  No.

14           DESIGNATED CHAIR:  Hold on.  You can ask

15   your question when Mr. Bredesen finishes his opening

16   statement.

17           MR. SLOAN:  Okay.

18           MR. BREDESEN:  Despite having been violently

19   assaulted such that he would be disabled for weeks if

20   not months, no one ever saw anything on him.  There were

21   no marks, no bruises, no objective abnormalities

22   whatsoever.

23           We also learned through discovery that Sloan

24   had falsified his resume materially, and this goes to

25   the disputes or the tensions that did exist between

1    Mr. Sloan and Mr. Stargardt and Mr. Sloan and

2    Mr. Fizzel.  It's clear that Mr. Sloan had lied to get

3    the job and was lazy and incompetent on the job as well.

4            We will also establish that Mr. Sloan has

5    lied under oath in this claim and to board agency

6    officials, particularly the pre-hearing officers about

7    his prior claims.

8            We sought initial discovery and Mr. Sloan

9    used what I term the secret agent in defense on two

10   discovery attempts.  He claimed that there was a prior

11   claim that had been sealed by the government because of

12   military classified matters.  He couldn't talk about it.

13   He couldn't tell us about it, couldn't say anything

14   about it.  That was all completely untrue.

15           The records were located.  They were never

16   placed under seal.  They had nothing to do with any

17   military matters.  Although he did work on a defense

18   base, he was injured on his day off while out on a

19   pleasure boating cruise.

20           His motive for wanting to hide that

21   discovery was very clear when we got the records.  The

22   records showed that he had previously litigated a prior

23   bogus claim.  The records show he sought disability for

24   several years' worth, including claims for social

25   security and retraining benefits in California, but the

 1  records also uncovered that during that entire claim he
 2  was self-employed.
 3          In the end Mr. Sloan, we're going to ask
 4  that you find Mr. Sloan not credible.  We have made a
 5  number of specific factual finding requests set forth in
 6  my briefing related to what I told you about.  We're
 7  going to ask for a finding of fraud and an award of
 8  attorney's fees and costs.
 9          Thank you.
10          DESIGNATED CHAIR:  Mr. Sloan, you had a
11  question?
12          MR. SLOAN:  I have several of them now.  He
13  stated that the employer decided I was going to lie
14  about my injury.  When did they decide that, before the
15  injury happened or just as the injury was occurring?
16          Mr. Bredesen?
17          MR. BREDESEN:  Quite frankly, it's our
18  position that you had decided to fabricate a claim and
19  you did so.
20          MR. SLOAN:  When was this decided?
21          MR. BREDESEN:  You tell us.
22          MR. SLOAN:  You tell me.  You are the one
23  making the statement, Mr. Bredesen.  That's a pretty
24  serious misstatement.
25          MR. BREDESEN:  The records will show that


Exhibit 1
Page 16 of 38

1   you went into the clinic on the 25th of September, 2003,

2   and alleged to Mr. Kristman that you had been assaulted,

3   that you had been body slammed.

4              You further testified and explained that it

5   occurred in the busing area of the dining hall.  And

6   it's our position that that never happened, so

7   apparently you decided to fabricate a claim on or about

8   --

9              MR. SLOAN:  You decided that this was a lie.

10  I mean, this is a pretty serious accusation,

11  Mr. Bredesen.  It's totally unfounded by any

12  documentation you have presented.

13             MR. BREDESEN:  We filed this fraud petition

14  a long time ago, Mr. Sloan.

15             DESIGNATED CHAIR:  Mr. Sloan, I don't know

16  if it really matters so much when the employer decided

17  that this was fraud.  What matters is the events that

18  took place, the board's determination about who is

19  credible and who is not credible here, so the board will

20  really be the ones to decide those particular issues.

21             And when the employer decided this was a

22  fraudulent claim doesn't have much to do with this case

23  here today.  The bottom line is that they are claiming

24  that it is fraud here and now, and as they have gathered

25  evidence apparently they have come to that

1    determination.

2              And the issue is whether the board is going

3    to evaluate this evidence in the same way.

4              MR. SLOAN:  Okay.  A second question.  Do

5    you have any documentation to support your allegation

6    that this sealed order by a federal judge was for a

7    secret agency and pertaining to military matters?

8              MR. BREDESEN:  That was your contention.

9              MR. SLOAN:  I just told you it was sealed.

10             DESIGNATED CHAIR:  Well, Mr. Sloan, the

11   parties can tell us more about that as we go along.  I'm

12   sure we'll here from you about your sealed record, and

13   I'm sure we'll hear more from Mr. Bredesen about their

14   efforts to obtain pertinent records, so jot that

15   question down and you bring it up later on if you think

16   it hasn't been addressed sufficiently.

17             MR. SLOAN:  I will.

18             DESIGNATED CHAIR:  Are you ready to go ahead

19   with your opening statement?

20             MR. SLOAN:  The third question about this

21   bogus claim and has he had any documentation supporting

22   any bogus claim?

23             MR. BREDESEN:  Yes.  It's all been filed and

24   well laid out in my brief, Mr. Sloan.

25             MR. SLOAN:  Have you provided any -- I have

Exhibit  1
Page  18  of  38

1    noticed in your brief that you use two different

2    terminologies, likely fraud.  Then you go on to say it

3    was fraud, but you don't have -- you haven't produced

4    any documentation to support your allegation.

5            DESIGNATED CHAIR:  All right.  Well,

6    Mr. Sloan, the board will decide whether this is fraud

7    or not based upon the employer's contention and the

8    proof they put on and your statements and the proof you

9    put on.

10           So I think it's clear that they believe this

11   is fraud.  Otherwise, they wouldn't be bringing this

12   petition.  And it's up to the board to decide after we

13   have heard everything whether or not fraud has occurred

14   in this case.

15           MR. SLOAN:  Okay.

16           DESIGNATED CHAIR:  Are you ready to go ahead

17   with your opening statement?

18           MR. SLOAN:  Yes.  I'm going ahead with this.

19   Do I bring this -- this is where I can bring this novel

20   circumstances here up?

21           MR. BREDESEN:  I think he is referring to my

22   legal argument about awards of attorney's fees and costs

23   as opposed to providing a summary of the facts of the

24   case.

25           MR. SLOAN:  Excuse me, Mr. Bredesen, you

Exhibit  1
Page 19 of 38

1   don't represent me.

2              MR. BREDESEN:  Of course, I do not.

3              DESIGNATED CHAIR:  Mr. Sloan, can you state

4   what it is you are addressing here?

5              MR. SLOAN:  Mr. Bredesen is claiming that

6   this case appears to present a somewhat novel

7   circumstance -- (inaudible) -- paying any compensation

8   to Sloan before paying any medical bills yet was forced

9   to defend a claim which Sloan filed.  Thus no award can

10  only be issued under another benefits clause.  It is --

11  (inaudible) -- that this clause encompasses both

12  peculiarity and non-peculiarity benefits that a claimant

13  obtains.  (Inaudible) -- all of which are provided for

14  under the act.

15             Now, this is -- basically this is fraud.  I

16  mean, you're claiming that people don't have the right

17  to due process of law and discovery.  And another thing

18  is, you know, I repeatedly asked Mr. Bredesen many, many

19  times to provide discovery.

20             And he goes on to say in this statement that

21  they have several thousand documents.  I have never been

22  provided with several thousand documents.  I have only

23  been provided with a few hundred documents.

24             And then again we go on to this -- looking

25  at this statement from Mr. Melvin Purvis (phonetic) and

1    in his deposition statement Mr. Bredesen provided he

2    goes on that he never witnessed any body contact.

3            But if you go on to Mr. Fizzel's statement,

4    he did indicate there was body contact.  You know, there

5    was physical contact.

6            Another thing is in the deposition of Melvin

7    Alstots, he indicates this room was a small room of 20

8    by 20 feet.  Well, that's, you know -- from your

9    deposition when you have several hundred people filing

10   through this dishwashing area in a matter of an hour or

11   two, you know, what is Mr. Purvis going to notice.

12           The thing is he was working at the time.  He

13   was extremely busy.  I'm sure everybody realizes that

14   washing dishes is a hard job.  He was running a very

15   complicated and very noisy machine at the time.  He was

16   handling cleaning up after pots and pans that had

17   prepared meals for several hundred people, and were

18   ongoing process of preparing other meals for lunch time.

19           These people work very, very hard.  And a

20   lot of people have their hats off to them, but, you

21   know, how are they going to notice everything that's

22   around them.  I sincerely doubt it, especially when you

23   are busy.

24           When I'm working, I get focused on my job.

25   And when I looked at Mr. Purvis, he was looking down

1    when I was body slammed, because I happened to be facing
2    that way.

3                Another thing, the statements of Carl
4    Stargardt, now, these are statements -- these were filed
5    with the Alaska Department of Troopers, Trooper Edwards,
6    I believe he was in Dillingham at the time.  I filed a
7    complaint against Mr. Carl Stargardt for attempting to
8    kick me on the 24th of October.

9                And I filed a complaint against Mr. Douglas
10   Fizzel for body slamming me on the 25th of October.  And
11   at all times during this whole thing, the medic Dana
12   Campbell has indicated that her medical decision was
13   decided by a Mary McCully (phonetic), a member of
14   management.

15               She is also, as she testified in her
16   deposition, that she was provided information by --
17   what's that girl's name -- another girl that was a
18   member of management concerning plane flights.

19               Now, I have the deposition here that
20   Mr. Bredesen brought up that I was offered a flight off
21   the island on the date of injury.  I have -- I have
22   already provided to the board documents from the United
23   States Air Force indicating when there were flights and
24   when there were none.

25               I was injured on the 25th.  There were no

Exhibit  1
Page 22 of 38

 1   flights.  The flight after that was canceled.  And I
 2   don't believe there was a flight until the 28th or the
 3   29th.  I'm not sure which day that is.
 4           I believe that Mr. Stargardt has had
 5   continual problems over the years.  Basically, he is a
 6   strange individual.  He has falsified documents about
 7   other people, allegations of other employees on the
 8   island on a continuous basis for years.
 9           He alleges that he is a police officer and
10   he knows how to conduct private background
11   investigations on people and continually comes up with a
12   lot of bogus information on people that simply just
13   doesn't hold water.
14           MR. BREDESEN:  I would like to state an
15   objection to this -- excuse me.  I'm going to object.
16           DESIGNATED CHAIR:  Hold on a second,
17   Mr. Sloan.  Mr. Bredesen has an objection.
18           MR. BREDESEN:  Opening statements are
19   limited to summations of evidence that will be presented
20   at hearing.  Mr. Sloan, there is no evidence in the
21   record about Carl Stargardt falsifying information about
22   third parties.
23           There will be no information presented at
24   hearing about Carl Stargardt doing any --
25           MR. SLOAN:  In the record, you had an


Exhibit  1
Page 23 of 38

1    investigation on me based that I was a Michael Thomas

2    Sloan married to a Molly Sloan of Talkeetna,

3    Mr. Bredesen.

4             I suggest that this came as input from

5    Mr. Carl Stargardt.

6             DESIGNATED CHAIR:  Well, Mr. Sloan, you can

7    bring this up in your closing argument if it remains an

8    issue.

9             Do you have additional argument?

10            MR. SLOAN:  Basically, looking through these

11   claims here that Mr. Bredesen is also bringing up that,

12   you know, claims I fraudulently filed a claim.  He has

13   not presented any documents to support any of this

14   allegations.

15            He is using secondhand information.  He has

16   not even filed a complete medical from medical care

17   providers, the medical papers, just one side of it,

18   which basically was found not to have any water -- carry

19   any water or weight.  Basically this one doctor

20   basically claimed I was dumb.  That seems to be the

21   extent of his medical opinion.

22            But that was the third party doctor.  Now,

23   on this other incident, Mr. Bredesen has never presented

24   any third party doctor for inspection to any medical

25   opinion.  Also, you know, the MRI seems to be misquoted.

Exhibit  1
Page  24  of  38

1    I included that to the board.

2          There is an MRI verifying that I did have a

3    dislocated disk and I did submit all of the documents

4    from Dr. Moser basically about the injury and his claim

5    was basically that the medical providers to that date

6    had not been treating this aggressively enough.

7          I also have provided to the board a

8    statement by the physical therapist, Peggy Carghill has

9    basically been ignoring the patient, me, and these are

10   all matters of document there.

11         DESIGNATED CHAIR:  Okay.  Anything else?

12   You have used up about ten minutes of your time.  Do you

13   want to save the rest?

14         MR. SLOAN:  Yeah.  We have allegations that

15   I was an incompetent technician, even though I have also

16   submitted references from several people on the island

17   basically stating to my competency as a technician.

18         Mike Whitmills stated that I had

19   effectively, consistently worked above Air Force

20   standards in regards to radios.  Mr. Kevin Killahuney

21   (phonetic) says since my arrival on the island I

22   effectively increased the range of the ground air radio

23   communications, improving the safety on the island.

24         My fellow co-worker, Larry Peterson, states

25   I am a very knowledgeable technician.

1              DESIGNATED CHAIR:  Well, Mr. Sloan, do --

2              MR. SLOAN:  Some other supervisors on the

3    island --

4              DESIGNATED CHAIR:  Mr. Sloan, do you want to

5    save your other ten minutes?

6              MR. SLOAN:  Pardon?

7              DESIGNATED CHAIR:  I told you before you

8    have a total 20 minutes to use for your opening and

9    closing.  You have used up about ten minutes.  Do you

10   want to save the rest?

11             MR. SLOAN:  Okay.  I'll save the rest for my

12   closing.

13             DESIGNATED CHAIR:  All right.  Then I'm

14   going to ask Mr. Bredesen to go ahead and give us a

15   statement of what he is going to be proving here today

16   and then go ahead and call his first witness.

17             MR. BREDESEN:  I believe I gave you my

18   opening statement.  And I'm going to call Mr. Sloan

19   right off the bat.

20             DESIGNATED CHAIR:  Mr. Sloan, I'm going to

21   ask you to raise your right hand to be sworn.

22                       THOMAS SLOAN,

23        being first duly sworn, testifies as follows:

24                       EXAMINATION

25   BY MR. BREDESEN:

Exhibit 1
Page 26 of 38

1    Q.   Have you alleged that Mr. Fizzel had sexual

2    desires towards you; is that correct?

3    A.   He made some statements and touched me on parts

4    of my body.

5    Q.   Okay.  Where did he touch you?

6    A.   Once on the buttock.  And another time he

7    attempted to grab me in the crotch.

8    Q.   Okay.  And you perceived that as a sexual

9    advance?

10   A.   Yes, I did.

11   Q.   And you have told others that, haven't you?

12   A.   Yes, I have.

13   Q.   Okay.  You also claim that Mr. Fizzel assaulted

14   you on October 25, 2003?

15   A.   That's correct.

16   Q.   And that was in the busing area of the dining

17   hall?

18   A.   Yes.

19   Q.   And you were at the table where -- actually

20   depositing trays and dishes at the time of the assault?

21   A.   I was at a stainless steel table depositing -- I

22   believe I was putting some silverware off of my tray at

23   the time into a bus dish.

24   Q.   And Mr. Fizzel ran at you and slammed his body

25   into you?



Exhibit  1
Page 27 of 38

1    A.   Yes.  He is in the habit of chest butting people

2   and he just took off, ran and slammed into me.

3    Q.   And he hit you hard?

4    A.   Yes, he did.

5    Q.   And it felt like you were hit by a truck?

6    A.   It felt like I was hit hard, Mr. Bredesen.

7    Q.   Okay.  But you previously testified that you felt

8   like you were hit by a truck?

9    A.   Well, I haven't read the deposition, so it's been

10  a long time.

11   Q.   And you felt dazed as a result?

12   A.   I had like a whiplash, Mr. Bredesen.  You know, I

13  felt disoriented.

14   Q.   And you were knocked partially over the table,

15  correct?

16   A.   I was standing straight up, Mr. Bredesen.  I was

17  not leaning over a table.  The table and the bus dishes

18  would have been almost -- just below mid chest.

19   Q.   But when you were struck, I mean, that knocked

20  you practically over the table, did it not?

21   A.   No, it did not.  He hit me from the side,

22  Mr. Bredesen.  The table was going one way.  I was

23  whiplashed along the side of the table.  I didn't

24  actually touch the table.

25   Q.   And then after that, Fizzel ran away from you

1  laughing?

2      A.  Yes, he did.  He ran about three or four feet

3  away, out of arm's reach, and he was laughing about it.

4      Q.  And you yelled at him?

5      A.  Yes, I did.

6      Q.  And the person who was operating the dishwasher

7  was standing right there, but said nothing?

8      A.  No, he wasn't standing right there.  He was off

9  to the side of me about five feet on the other side of

10  the table.

11      Q.  So he was within five feet of you?

12      A.  He was also in a very noisy area, Mr. Bredesen.

13  After the discussion with Mr. Fizzel, I looked around, I

14  noticed several people were looking.  Mr. Purvis was

15  also looking at me.  No one said anything.

16      Q.  Several people were looking?

17      A.  There was Joan Eby (phonetic).  There was another

18  man that I told you before I couldn't identify at all.

19      Q.  Actually, I don't recall you mentioning that in

20  your deposition.  As I recall your deposition you

21  mentioned only Ms. Eby.

22      A.  There was Joan Eby.  I mentioned there was

23  another man there that I didn't know who he was, and

24  there was Mr. Purvis.  There may have even been other

25  people there, but I didn't see them.  All I seen was

Exhibit 1
Page 29 of 38

1  these three people.

2    Q.  Okay.  Well, the board can review your deposition

3  transcript to see if you mentioned any other people

4  being present.

5      But Mr. Alstots was within five feet of you and

6  didn't say anything?

7    A.  No, he didn't.

8    Q.  But he was within five feet of you?

9    A.  He was on the other side of the table.  I would

10  say more like five-foot down the table and we were about

11  three feet.  Like the table had to have been about

12  either two and a half or three feet wide, so it was

13  diagonal.

14      But I happened to be looking that way when I was

15  hit and he was looking straight down.

16    Q.  Can you explain why if there are all of these

17  witnesses nobody has come forward to support your

18  allegation at all that you were assaulted on that day?

19    A.  I understand, Mr. Bredesen, you have been trying

20  to locate Joan Eby by writing someplace in Texas and,

21  you know, I haven't been able to contact her.  I was

22  never provided with any information until late in the

23  game about any contact address to her.

24      Basically, from what I understand, Mrs. Eby --

25  Ms. Eby or whatever her name is, was removed -- was


Exhibit  1
Page  30  of  38

1   having problems on the island and I wasn't there any

2   longer.

3       Q.   I would note for the record that information,

4   which we had to follow-up to locate Ms. Eby was provided

5   to Mr. Sloan's former attorney in 2004, and was

6   re-served on him in 2005.

7       A.   Okay.  2005.  Like I say --

8       Q.   Excuse me, Mr. Sloan.  My next question --

9       A.   No, let's deal with this.

10      Q.   Excuse me.

11      A.   I intend --

12          MR. BREDESEN:  Please direct the witness.

13      A.   I have not been able to locate Ms. Eby.

14      Q.   You weren't asked a question.

15          DESIGNATED CHAIR:  Mr. Sloan, make a note of

16  the things that you want to present in response to

17  Mr. Bredesen's questions and you can deal with this at

18  that time.

19          Just if you could give us a yes or no and a

20  brief response then Mr. Bredesen can move through your

21  direct examination.

22      Q.   I would like to direct the board's attention to

23  Exhibit No. 5 to my brief.  This is a letter which it

24  appears Mr. Sloan submitted to an Air Force official

25  looking for information.

Exhibit     1
Page   31   of   38

1        And I would direct the board's attention to the

2    second paragraph, specifically the second sentence, in

3    which you stated to the Air Force official that two CES

4    employees were responsible for assaulting you causing

5    injury on October 25, 2003.

6        Do you recall sending this letter, Mr. Sloan?

7    A.   Yes, I did.

8    Q.   Okay.  I would next like to direct the board's

9    attention to Exhibit No. 6.  It's a pre-hearing

10   conference summary for the conference on March 10, 2005.

11       On the second page, towards the top it indicates

12   that I asked you to identify the second person, and you

13   identified Carl Stargardt.

14       Do you recall doing that?

15   A.   Yes.  Carl Stargardt, I believe, and Mr. Fizzel

16   were operating as a team.  You know, Carl Stargardt's

17   attempted assault on the 24th failed and that seemed to

18   anger both of them.

19   Q.   But you didn't tell the Air Force official that

20   they were separate assaults, did you?

21   A.   I filed with that letter both of the complaint

22   forms that I originally filed with CES, one for the 24th

23   and one for the 25th.  You are just using one page of

24   documentation I sent in, Mr. Bredesen.

25   Q.   But the letter to the Air Force official



Exhibit    1
Page  32  of  38

1    indicates that two individuals were responsible --

2    A.  Contacts --

3           MR. BREDESEN:  Would you please advise the

4    witness?

5    A.  -- explains to the Air Force official that there

6    were two separate --

7    Q.  Mr. Sloan, I believe the hearing officer has

8    something to say.

9           DESIGNATED CHAIR:  Mr. Sloan, if you will

10   just jot down a note on that.  You can clarify it when

11   you make your statement after Mr. Bredesen's questions.

12   Q.  Your letter to the Air Force official indicates

13   that you had been assaulted by two persons in a single

14   incident, doesn't it?

15   A.  I have already explained that, Mr. Bredesen.

16   Q.  Okay.  You have no explanation for that?

17   A.  I have already explained it.

18   Q.  Okay.  Then back to the pre-hearing summary, back

19   to page two.  After I asked you about that, you then

20   indicated that Mr. Stargardt had assaulted you on a

21   separate occasion the day before the reported day of

22   injury.

23          Do you recall doing that?

24   A.  That's what I indicated, Mr. Bredesen.

25   Q.  Okay.  So then your story changed from a single

1    assault by two people to two separate assaults by

2    different individuals?

3        A.   Mr. Bredesen, it was never assault by one.  It

4    was always assault by two people during this whole time.

5        Q.   Well, I thought you just told me that it was

6    Mr. Fizzel who ran up and body slammed you.  When did

7    Mr. Stargardt attack you in the busing area?

8        A.   I told you it was on the 24th, Mr. Bredesen.

9        Q.   So the morning before you were attacked by

10   Mr. Stargardt in the busing area as well?

11       A.   I believe the document states it happened at the

12   shop, Mr. Bredesen, the incident complaints that were

13   submitted.

14       Q.   You have answered my question.  You have also

15   told the Air Force official in Exhibit No. 5, the first

16   sentence, slash paragraph, you indicated that two CES

17   employees were discovered assaulting a baby fox at the

18   station.

19            Do you recall making that statement?

20       A.   Yes.  That's basically my understanding of the

21   situation.

22       Q.   During the pre-hearing reflected in Exhibit

23   No. 6, you identified those two individuals as

24   Mr. Fizzel and Mr. Stargardt, correct?

25       A.   That is correct.

1    Q.  And during the deposition of Mr. Fizzel, you

2    described the incident as Mr. Fizzel and Mr. Stargardt

3    stomping this poor little baby fox half to death,

4    correct?

5    A.  Pretty much.

6    Q.  Okay.  But as Exhibit No. 6 notes, you admitted

7    during the pre-hearing you never witnessed any such

8    incident, didn't you?

9    A.  Like I said during the pre-hearing, Mr. Bredesen,

10    this is common knowledge.

11    Q.  Yes or no, Mr. Sloan.  Did you or did you not

12    witness the incident?

13    A.  It's common knowledge, and I have witnessed

14    Mr. Stargardt doing this to animals on the island.

15    Q.  Where are those witnesses?

16    A.  I'm one of the witnesses.

17    Q.  Okay.  Any other witnesses?

18    A.  Yeah, there is witnesses from the FAA, Mr. Mike

19    Whitmills witnessed it.  Mike Moran has witnessed this

20    action.  You know, this has been ongoing for years.

21    Q.  Did I hear you correctly?  Did you just say that

22    you witnessed the incident?

23    A.  Not this incident, another incident just like

24    this.

25    Q.  What other incident?

Exhibit 1
Page 35 of 38

1    A.    Where Mr. Stargardt attacked an animal like that.

2    Q.    What animal?

3    A.    A fox, another fox.

4    Q.    So you actually saw Mr. Stargardt attack a fox?

5    A.    This is ongoing continuous.

6    Q.    Yes or no.  Did you see Mr. Stargardt --

7    A.    Yes.

8    Q.    Okay.  And what did you see happen?

9    A.    I was working in -- this was in the gator

10   (phonetic) site and I was working on a radio system.

11   Mr. Stargardt came in.  I don't know why he even came

12   there.  And he left the door open.

13        A fox came in and he just -- it was automatic, he

14   attacked it and kicked it.  There was another witness to

15   that event too.

16   Q.    So I presume you reported that?

17   A.    I was just new on the island.  I didn't know what

18   happened.  Me and the other gentlemen talked about it.

19   Q.    You thought it might be okay for people to hurt

20   foxes?

21   A.    I don't think it's okay, Mr. Bredesen.  I thought

22   it was unusual.  And I believe things on that island

23   were very strange.

24   Q.    But you never did witness the incident that you

25   publicly accused them of, of stomping a poor little baby

Exhibit 1

Page 36 of 38

1  fox half to death, correct?

2    A.   I seen that little fox right by me.

3    Q.   But you never saw them touch them, did you?

4    A.   Somebody else did.

5    Q.   Yes or no?

6    A.   I think I answered your question.  I didn't see

7  the incident, but it was common knowledge.

8    Q.   Okay.  But you don't have anybody here to testify

9  --  (end of CD).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit _____/_____
Page 37 of 38

```
1                    TRANSCRIBER'S CERTIFICATE

2

3      I, SONJA L. REEVES, hereby certify that the foregoing

4   pages numbered 1 through 38 are a true, accurate and

5   complete transcript of proceedings in Case No. 200317063

6   transcribed by me from a copy of the electronic sound

7   recording to the best of my knowledge and ability.

8

9

10   18 Feb 07                    Sonja L. Reeves

11   DATE                    SONJA L. REEVES, TRANSCRIBER

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 1
Page 38 of 38